## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**JASON M. ROE**                                                     **CIVIL ACTION**

**VERSUS**                                                              **NO. 20-2484**

**DARREL VANNOY**                                           **SECTION: "D"(3)**

## REPORT AND RECOMMENDATION

Petitioner, Jason M. Roe, a Louisiana state prisoner, filed this federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254.  For the following reasons, it is recommended that his application be **DISMISSED WITH PREJUDICE**.

On February 28, 2013, petitioner was convicted of two counts of armed robbery (Counts 1 and 2), one count of possession of a firearm by a convicted felon (Count 3), and one count of illegal possession of a stolen firearm (Count 4).[1]  On May 14, 2013, he was sentenced to the following terms of imprisonment: seventy years on Counts 1 and 2; fifteen years on Count 3; and five years on Count 4.  It was ordered that those sentences be served concurrently and without benefit of probation, parole, or suspension of sentence.[2]

Petitioner appealed.  However, while that appeal was pending, further proceedings were held in the state district court.  Specifically, on January 6, 2014, petitioner, pursuant to a plea agreement, pleaded guilty to being a third offender and was resentenced as such on the armed robbery convictions to a term of seventy years imprisonment.[3]

---

[1] State Rec., Vol. 1 of 11, minute entry February 28, 2013.
[2] State Rec., Vol. 5 of 11, transcript of May 14, 2013; State Rec., Vol. 1 of 11, minute entry dated May 14, 2013; see also State v. Roe, No. 507-511, 2013 WL 12093984 (La. Dist. Ct. May 14, 2013).
[3] State Rec., Vol. 1 of 11, minute entry dated January 6, 2014; State Rec., Vol. 1 of 11, plea form.

Then, on October 8, 2014, the Louisiana Fourth Circuit affirmed petitioner's convictions on Counts 1, 3, and 4, but reversed his conviction on Count 2 for lack of sufficient evidence. With respect to Counts 3 and 4, the Court of Appeal affirmed his sentences.[4] But, unaware of the aforementioned habitual offender proceedings and of the fact that the state district court had already vacated petitioner's original unenhanced sentence on Count 1, the Court of Appeal also vacated the original unenhanced (but no longer extant) sentence on Count 1 and remanded the matter for resentencing.[5] On August 28, 2015, the Louisiana Supreme Court then granted petitioner's related writ application, but only in part. Specifically, the Supreme Court vacated the conviction and sentence on Count 4 as violative of the Double Jeopardy Clause, but it denied relief in all other respects.[6]

To further complicate matters, the district court, on November 9, 2015, then held the resentencing ordered by the Court of Appeal and resentenced petitioner on Count 1 to sixty-five years for the armed robbery, plus an additional consecutive five years for his use of a firearm during the crime as mandated by La. R.S. Ann. § 14:64.3(A), without benefit of probation, parole, or suspension of sentence.[7] Petitioner again appealed.

---

[4] However, as to Count 3, the Court of Appeal faulted the district court for failing to impose the mandatory fine and directed the court to correct that error.

[5] State v. Roe, 151 So. 3d 838 (La. App. 4th Cir. 2014); State Rec., Vol. 6 of 11. As to the sentence on Count 1, the Court of Appeal noted that the district court failed to impose the additional penalty required by La. R.S. Ann. § 14:64.3(A), which provides:

> When the dangerous weapon used in the commission of the crime of armed robbery is a firearm, the offender shall be imprisoned at hard labor for an additional period of five years without benefit of parole, probation, or suspension of sentence. The additional penalty imposed pursuant to this Subsection shall be served consecutively to the sentence imposed under the provisions of R.S. 14:64.

La. R.S. Ann. § 14:64.3(A).

[6] State v. Roe, 177 So. 3d 125 (La. 2015); State Rec., Vol. 11 of 11.

[7] State Rec., Vol. 1 of 11, transcript of November 9, 2015; State Rec., Vol. 1 of 11, minute entry dated November 9, 2015; see also State v. Roe, No. 507-511, 2015 WL 11837281 (La. Dist. Ct. Nov. 9, 2015). In the resentencing, the court also imposed the fine with respect to Count 3 as directed by the Court of Appeal.

When that new appeal came before the Court of Appeal, that court noted the foregoing sequence of events and then simply affirmed, opining that petitioner had not "appealed the terms of the habitual offender resentence" and, therefore, "the terms should not be disturbed" and petitioner's agreement "made under the habitual offenders statute remain[s] intact."[8]   The Louisiana Supreme Court then denied petitioner's related writ application on December 17, 2018.[9]

In addition to those direct-review proceedings, petitioner also sought collateral review in the state courts by filing an application for post-conviction relief.[10]   However, post-conviction relief was denied by the state district court on March 13, 2019,[11] the Louisiana Fourth Circuit Court of Appeal on September 19, 2019,[12] and the Louisiana Supreme Court on July 24, 2020.[13]

In summary, after the conclusion of the state court proceedings, only two of petitioner's convictions remained in place: one count of armed robbery (Count 1) and one count of possession of a firearm by a convicted felon (Count 3).

On or about September 9, 2020, petitioner filed the instant federal application seeking habeas corpus relief.[14]   The state filed an answer conceding that the application is timely and that petitioner's claims are exhausted; however, the state argues that the claims fail on the merits.[15] Petitioner was afforded an opportunity to file a reply,[16] but no reply was filed.

---

[8] State v. Roe, 240 So. 3d 351, 354 (La. App. 4th Cir. 2018); State Rec., Vol. 9 of 11.
[9] State v. Roe, 258 So. 3d 599 (La. 2018); State Rec., Vol. 9 of 11.
[10] State Rec., Vol. 10 of 11.
[11] State Rec., Vol. 2 of 11, Ruling with Reasons dated March 13, 2019.
[12] State v. Roe, No. 2019-K-0751 (La. App. 4th Cir. Sept. 19, 2019); State Rec., Vol. 10 of 11.
[13] State v. Roe, 299 So. 3d 52 (La. 2020); State Rec., Vol. 10 of 11.
[14] Rec. Doc. 1.
[15] Rec. Doc. 26.
[16] See Rec. Doc. 3, p. 2.

## I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002); accord Langley v. Prince, 926 F.3d 145, 155 (5th Cir. 2019) (noting that the AEDPA imposes a "relitigation bar" on claims adjudicated on the merits by the state court), cert. denied, 140 S. Ct. 2676 (2020).  The applicable standards of review are now as follows.

As to pure questions of fact, factual findings are presumed to be correct and a federal court must give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (footnotes, internal quotation marks, ellipses, and brackets omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 572 U.S. 415, 426 (2014). However, a federal habeas court must be mindful that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694; accord Harrington v. Richter, 562 U.S. 86, 102-03 (2011) ("Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." (quotation marks omitted)); Langley, 926 F.3d at 156 ("The Supreme Court has repeatedly held that it is not enough to show the state court was wrong."); Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable."). Therefore:

> "[T]he [AEDPA's] relitigation bar forecloses relief unless the prisoner can show the state court was *so* wrong that the error was well understood and comprehended

> in existing law beyond any possibility for fairminded disagreement. In other words, the unreasonable-application exception asks whether it is beyond the realm of possibility that a fairminded jurist could agree with the state court.

Langley, 926 F.3d at 156 (citations and quotation marks omitted). "Under AEDPA's relitigation bar, the very existence of reasonable disagreement forecloses relief." Id. at 170.

Further, the Supreme Court has expressly cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Woodall, 572 U.S. at 426 (citations and quotation marks omitted). Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).

In summary, "AEDPA prevents defendants – **and federal courts** – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." Renico v. Lett, 559 U.S. 766, 779 (2010) (emphasis added). The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein. Woodall, 572 U.S. at 417.

## II. Facts

Petitioner was tried jointly with his co-defendant, Joshua A. Watson. As noted, although petitioner was charged with and convicted of four counts, only two of his convictions remain in

place:  one count of armed robbery (Count 1) and one count of possession of a firearm by a

convicted felon (Count 3).   On direct appeal, the Louisiana Fourth Circuit Court of Appeal

summarized the evidence concerning those two counts as follows:[17]

> Roe and Watson were convicted of the 17 January 2011 armed robbery of Jonathan Henley ("Henley").  …
>
> New Orleans Police Department ("NOPD") 911 Operator Lynerell Varise identified a 911 incident recall from 17 January 2011, and a corresponding audio recording of that call, which was played for the jury.  The 911 call came in at 6:45 p.m. Ms. Varise confirmed that the 911 caller declined medical assistance.  She was not sure if the caller was injured, but noted that he did say he had a knot on the back of his head.  The caller said he had drawers on, and that "they" got his clothes.
>
> Jonathan Henley, then twenty-three years old, testified that on 15 January 2011, he encountered a male named "Yellow" at a Petro gas station on Elysian Fields Avenue in New Orleans.  Later in his testimony, he identified Watson as "Yellow."  Henley testified that Watson alerted him that he had dropped some money on the ground.  When he picked it up, Watson told him that he had some Xanax "bars" and some marijuana for sale.  Henley saw Watson later that same day at a "Brothers" gas station on Elysian Fields Avenue, at which point he and Watson exchanged telephone numbers.  Henley decided to purchase marijuana from Watson at that time.  They talked on 17 January 2011, and they came to an agreement for Watson's sale to Henley of two ounces of marijuana for $900.00.
>
> Later on the day of 17 January 2011, Henley drove his silver Chevrolet HHR rental car to a meeting with Watson in an alley alongside a Subway restaurant.  Watson was in a green Chevrolet TrailBlazer automobile, which he exited to enter the passenger side of Henley's vehicle.  Henley said he took out his money, and Watson showed him the marijuana.  Henley was counting out his money when Watson pulled a semiautomatic pistol and told him to "give it up," stating that it was a robbery.  Henley gave Watson the money.  Another male exited the other vehicle and tapped on Henley's driver's side window with a revolver, telling him to open the door.  Henley later identified this individual as Roe.  Roe ordered Henley out of his car and directed him to take his clothes off and throw them in the car.  Henley complied, stripping down to his boxer shorts and undershirt and putting everything else in his car.  Henley said Roe then hit him with the revolver.
>
> When asked whether he gave Watson the money for the drugs or in response to the order to "give it up," Henley replied that he did so in response to Watson's order to "give it up."  Henley replied in the negative when asked whether he and Watson ever completed the drug deal.  His car was stolen in the robbery.  The only name he knew at that time was "Yellow."

---

[17] In that petitioner's convictions on Counts 2 and 4 have already been reversed by the state courts, the portions of the state court opinion concerning the evidence regarding those two crimes are not quoted herein.

Henley later met with NOPD Detective Duncan, who showed him what he estimated were six photo lineups, including State Exhibit 3, a single-photo of a female in connection with a "two-tone [Dodge] Charger." Henley identified State Exhibit 4, a photo lineup with his handwriting on the back, in which he did not select anyone's photo. Henley confirmed that in State Exhibit 5, another photo lineup, he selected a photo as someone who looked similar to one of the two robbers. In State Exhibit 6, Henley identified his handwriting on the back and testified that he picked out photo number six, which he identified as a photograph of the second robber, who had been armed with a revolver. He identified that individual in court as Roe. Henley identified State Exhibit 7 as a photo lineup with his handwriting on the back and on which he identified photo number three as being "Yellow." Henley identified "Yellow" in court as the other defendant present, Watson. Henley also identified State Exhibit 8 as a single photograph of Watson with a fleur-de-lis tattoo on his neck and wearing a dreadlock hairstyle. Henley said he still recognized them "[l]ike yesterday."

Henley testified on cross examination that he saw Watson at a Brothers gas station on Elysian Fields Avenue, probably some four or five hours after he first saw him at the Petro gas station, which also was on Elysian Fields Avenue. He said it was nighttime and that he was not sure why he went to the Brothers station, mentioning that he could have been purchasing chicken or a T-shirt. He said he told Watson hello in a friendly gesture because in their first encounter Watson had told him about the dropped money at the Petro station. He was also interested in purchasing some marijuana from Watson, and so the two exchanged phone numbers. Henley admitted that he smoked marijuana every day at that time. Henley confirmed that he owned a gun he had purchased from a store; that gun was taken/stolen in the robbery.

Henley further testified that he made arrangements with Watson to meet him at a Capital One Bank on Elysian Fields Avenue for the marijuana purchase/sale. Henley said he did not remember whether he smoked marijuana on 17 January 2011. He was planning to go to a party in Baton Rouge later that evening after purchasing the marijuana from Watson. The party was to be at the home of his friend, for whom he was purchasing marijuana – one ounce for himself, one ounce for his Baton Rouge friend. The robbery occurred at what he estimated was between 6:00-7:00 p.m., but he was not really sure about the time. It was Roe who hit him in the back of his head. Henley testified that after the robbery, he called police from a washateria.

Henley admitted that he was shown the photo lineup labeled as State Exhibit 4 and confirmed that none of the photos depicted light-skinned individuals, but said he signed the back of photo number one because the detective had told him to indicate anyone who looked similar to a perpetrator. He said he thought that the person in photo number one looked similar to Roe, but not Watson. However, under further cross examination Henley confirmed that the individual depicted in photo number four in State Exhibit 4 did not look anything like either Roe or Watson.

Henley acknowledged that all of the individuals depicted in the photo lineup labeled as State Exhibit 5 were dark-skinned. He admitted that both State Exhibits 4 and 5 (photo lineups) were shown to him by the police on 30 January 2011, after he had given them a description of the two suspects. However, he later testified that he never gave a description until he went to talk to the detective, and he guessed 30 January 2011 was the first time he talked to the detective. Henley further confirmed that the police showed him a photo lineup of dark-skinned individuals labeled as State Exhibit 9 on 17 March 2011. He confirmed that in the photo lineup labeled as State Exhibit 6, he identified Roe. He denied ever saying that he saw Watson in the St. Bernard Housing Project.

On redirect examination Henley identified his .40 caliber Glock Model 23 handgun – although he said he did not recognize the serial number at that time. He confirmed that he had given the serial number of his gun to the police. Henley confirmed that his gun was in his car when it was stolen, and said he believed it had been in the pocket on the passenger side door. He remembered telling the police that he believed Watson was all "tatted up," but did not initially specifically describe the fleur-de-lis tattoo on Watson's neck. However, he confirmed that he remembered that tattoo.

NOPD Officer Brooke Duncan IV testified that he was a detective on 17 January 2011. On that date, he went to the scene of an armed robbery involving Henley. The officer testified that Henley described the suspects as two light-skinned black males, one kind of stocky, and the other taller and with tattoos and long dread locks. One was nicknamed "Yellow" and had a tattoo of a fleur-de-lis on his throat and extensive tattoos on both arms. However, when questioned later on redirect examination as to why his report did not mention Watson's throat tattoo, Officer Duncan said he did not think the victim saw it. The victim reported that he had seen "Yellow," another male, and a woman the previous day, apparently in a cream and brown colored Dodge Charger automobile. On the night of the robbery, "Yellow" and the other perpetrator were in a blue/green colored Chevrolet TrailBlazer automobile. Henley admitted to Officer Duncan that he had been trying to purchase two ounces of high-grade marijuana, and the victim never changed his story. Henley had his personal .40 caliber Glock Model 23 handgun in his vehicle, which Officer Duncan listed as stolen on a NOPD database that was linked with the NCIC national database.

Officer Duncan stated that a vehicle matching the description of the two-tone Dodge Charger was subsequently stopped by the police with three people inside. Officer Duncan then compiled photo lineups (identified as State Exhibits 3, 4, and 5), one "lineup" apparently containing only a single photo of a female, the registered owner of the vehicle, and the other two lineups containing photos, respectively, of the two males who were also in that vehicle when it was stopped by the police. Officer Duncan said he considered the individuals in those lineups to be "more or less" light-skinned.

Officer Duncan said the next break on the case occurred in March 2011, when Roe was arrested in possession of Henley's Glock handgun, identified

through its serial number.  He said that prior to Roe's arrest, he had no suspects in the robbery.  He compiled separate photo lineups, one containing Roe's photo and the other containing a photo of Johnny Ray Barnes ("Barnes"), who was with Roe when Roe was arrested while in possession of Henley's handgun.  Barnes had an outstanding arrest warrant for attempted murder.  Officer Duncan identified State Exhibit 6 as the lineup he presented to Henley in which Henley identified Roe as the person who forced him out of his vehicle and hit him on the head with a chrome-colored revolver during the robbery.  Officer Duncan presented the lineup to Henley face down, and he said Henley identified Roe a few seconds after turning it over.  Officer Duncan also identified State Exhibit 9 as the lineup containing a photo of Barnes.  He said Henley made no identification in that lineup.

Officer Duncan testified that Henley telephoned him on 17 May 2011, and related that he had been visiting a girlfriend in eastern New Orleans when he saw Watson.  Officer Duncan immediately went to the scene and he saw Watson, who had shoulder-length dreadlocks and tattoos on his throat and his arms.  Officer Duncan identified Watson in court.  He stated that he approached Watson, advised him that he was a potential suspect in an armed robbery, and advised him of his Miranda rights.  Officer Duncan said when he asked Watson his whereabouts on 17 January 2011, Watson replied that he was in federal custody.

Officer Duncan later checked and determined that Watson had been in a federal halfway house on that date.  Officer Duncan identified State Exhibit 12 as Watson's sign-in/out sheet from a Volunteers of America ("VOA") residential facility, showing that he checked out of the facility at 3:00 p.m. on 17 January 2011.  He identified State Exhibit 7 as a photo lineup he presented to Henley on 19 May 2011, in which Henley selected Watson's photo.

Officer Duncan testified that he interviewed Henley on the scene on the night of the robbery and later that same night at the NOPD Third police station.  Henley told him that on the night of 15 January 2011, he was walking into a gas station, and Watson, whom Henley identified as "Yellow," told him that some money had fallen out of his back pocket.  Henley said he thanked Watson, whereupon Watson offered to sell him two grams of high-grade marijuana.  Henley said he and Watson exchanged telephone numbers and agreed to meet two days later to complete the marijuana sale.  Henley's description of Watson, besides his hair and tattoos, was of a short, stocky, light-skinned black male in his thirties.

Officer Duncan then testified to his execution of a search warrant on 23 March 2011 at 3424 Freret Street, Roe's last known address – the address he gave to former Officer Wheeler at the time he was arrested for illegal possession of Henley's Glock.  Discovered in the residence was a 19 January 2011 letter addressed to Roe at the address of 3424 Freret Street.

On cross examination, Officer Duncan said that Henley's vehicle was recovered on Spain Street in New Orleans.  The exterior was dusted for fingerprints, but no identifiable prints were recovered, probably due to rain the preceding day; he was uncertain whether the inside of the car was dusted for fingerprints.  He testified that Henley identified one person who had been in the two-tone Dodge

Charger as one of the two perpetrators. However, Officer Duncan later determined that that person had not been involved. He did not recall whether his report stated that "Yellow" had a fleur-de-lis tattoo on his neck, and the state stipulated that there was no such description in the report.

Former NOPD Officer Kevin Wheeler, who admitted that in November 2012 he was terminated from the NOPD for untruthfulness, testified that in March 2011 he responded to a call of an individual in the 2500 block of Valence Street who was wanted for a homicide. Officer Wheeler observed Roe and Barnes standing on the driver's side of a SUV partially pulled into a driveway in that block. Officer Wheeler, in full uniform, exited his marked police unit, approached the men, said hello, and asked them what was going on. He observed Roe reach into his pocket and pull out what appeared to be a handgun. Roe then reached into the vehicle and went to the floorboard. Roe and Barnes then walked off down Valence Street. Officer Wheeler said he went to the car and asked a youth sitting inside where the gun was, and the youth told the officer it was underneath the seat at the youth's feet. Officer recovered the gun, a loaded .40 caliber Glock Model 23. Officer Wheeler radioed other responding units, which stopped Roe and Barnes. He checked the gun's serial number in the NCIC database and discovered it had been stolen in an armed robbery.

Raymond Delaney testified that in January 2011, he was the assistant program director at a federal halfway house located in New Orleans. Mr. Delaney testified that in January 2011, Roe and Watson were residing in that federal halfway house. He said there were sign in/out sheets and cameras at the front entrance from which residents enter and leave. In addition, a security specialist contractor on duty would verify that the halfway house resident signing in/out was in fact the resident listed on the sheet, which sheet he said is actually inside a folder containing a photograph of the resident. A security specialist also verifies the date and time the resident is signing in or out.

Mr. Delaney testified that, contingent upon a resident's individual plan, the resident would leave the halfway house to go to work, to seek employment, to attend treatment, or go to any type of programming. No one was permitted to be out of the residence for more than twelve consecutive hours without approval from the Federal Bureau of Prisons. No one could leave the facility without verification of a case manager as to the reason for leaving. Mr. Delaney said that because of their respective statuses, Roe and Watson were very limited as to where they could go in the community. He replied in the negative when asked whether either Roe or Watson, for example, could have left to go to a friend's birthday party. However, he indicated that they could have left to look for a job or gone to work if they had a job – after the employment had been verified by an employment specialist.

On cross examination, Mr. Delaney testified that on 17 January 2011, Watson was employed by "Black Tie." He also confirmed that the Black Tie had to provide him with information confirming Watson was in fact employed by them. He acknowledged that the facility was a minimal security facility. While Mr. Delaney said on cross examination that he did not recall whether Roe or Watson

had any infractions while at the facility, he testified that both of them had been put on escape status in January 2011, after they both left the facility without permission on 22 January 2011. Watson voluntarily returned on 24 January 2011.

> ….
>
> NOPD Officer George Jackson was qualified by joint stipulation as an expert in latent fingerprint examination. Officer Jackson identified State Exhibit 21 as a fingerprint card containing a set of fingerprints he took the previous day from Roe in a back room of the courtroom. Officer Jackson identified State Exhibit 22 as a certified copy of a fingerprint card of Roe reflecting a booking date of 20 April 2001. The officer determined that the right thumbprints from State Exhibits 21 and 22 had been placed thereon by Roe. Officer Jackson confirmed that among the documents comprising a certified conviction packet ("cert. pack"), identified as State Exhibit 24, was an arrest register. He confirmed that the unique "folder" numbers, the State Identification ("SID") numbers, social security numbers, booking numbers, and partial names ("Jason M."), were the same on both the arrest register from the cert. pack and State Exhibit 22, the fingerprint card, both reflecting a 20 April 2001 booking date. Finally, Officer Jackson identified State Exhibit 25, a fingerprint card generated by the Louisiana Department of Corrections bearing the name Roe, and the same social security number as on State Exhibit 22 and the arrest register, and all bearing the same case number, 421-956. Minute and docket master entries in case number 421-956 reflected that on 13 March 2002, Roe pleaded guilty to two counts of attempted armed robbery, after being informed of his constitutional rights by the court and knowingly waiving them. He confirmed that to the best of his knowledge, based on the cert. pack in case number 421-956, the crime was attempted armed robbery.[18]

### III.  Petitioner's Claims

In his federal application, petitioner asserts three claims, all of which allege that his trial counsel was ineffective. The clearly established federal law governing such claims is <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). In <u>Strickland</u>, the United States Supreme Court held:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction … has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said

---

[18] <u>State v. Roe</u>, 151 So. 3d 838, 843-49 (La. App. 4th Cir. 2014); State Rec., Vol. 6 of 11.

that the conviction … resulted from a breakdown in the adversary process that renders the result unreliable.

Id. at 697.

When assessing whether counsel's performance was deficient, a federal court must always be mindful that "Strickland does not guarantee perfect representation, only a reasonably competent attorney." Harrington v. Richter, 562 U.S. 86, 110 (2011). Therefore, "[t]o establish deficient performance, a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness." Id. at 104 (quotation marks omitted). Moreover, the Supreme Court has cautioned:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

Strickland, 466 U.S. at 689 (citations and quotation marks omitted).

Strickland's prejudice component is no less exacting. The Supreme Court has explained:

> In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, Strickland asks whether it is reasonably likely the result would have been different. This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters only

in the rarest case. The likelihood of a different result must be substantial, not just conceivable.

Richter, 562 U.S. at 111-12 (citations and quotation marks omitted).

In the instant case, petitioner asserted his ineffective assistance of counsel claims to the state courts on collateral review. The state courts denied those claims on the merits as follows.

The state district court denied relief, stating:

The Application for Post-Conviction Relief filed on September 7, 2018, is timely, and presently before this Court raising three issues. All three issues are claims of ineffective assistance of counsel. A claim of ineffective assistance of counsel is reviewed under the two part test set out in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In order to prevail, a defendant must establish both that counsel's performance was deficient and that the deficiency prejudiced the defendant. To carry the burden, the defendant must show that there is a reasonable probability that, but for counsel's deficient performance the result of the proceeding would have been different.

Mr. Roe's first claim alleges that his counsel was ineffective for failing to investigate, and thereby failing to present an alibi defense. Mr. Roe argues that counsel failed to obtain the testimony of his employment supervisor who would have supported the defense that Mr. Roe was at work during the time of the armed robbery. In support of this claim, Roe presents a Volunteers of America Residential Re-Entry Center Sign In/Out Log wherein he signs in and out at certain times on January 17, 2011, the date if the armed robbery identified in Count 1. This document does not provide this Court with any information other than where the defendant claimed he would be going upon leaving the minimal security facility.

Defense counsel called at trial Mr. Delaney, the assistant program director at the federal halfway house where Roe and Watson were both residents at the time of these crimes. Delaney testified that both defendants could leave the halfway house to go to work, seek employment, attend treatment, or go to any type of programming, but were very limited as to where they could go in the community. Delaney further testified that Roe was employed by "Black Tie" on the date of the armed robbery in Count 1, and that both Roe and Watson were placed on escape status after they both left the facility without permission on January 22, 2011, the day after the armed robbery identified in Count 2.

This Court cannot imagine that defense counsel would have failed to call Roe's employer from "Black Tie" as a defense witness, if such a witness existed, who could have placed the defendant at work at the time of the robbery. Notably missing from this post-conviction application is a sworn and notarized affidavit from Mr. Roe's employer, immediate supervisor, or even fellow worker confirming that the defendant arrived at "Black Tie" and was actively engaged in a job on

January 17, 2011, at the time of the robbery.  This Court further notes that Roe was found with the victim's stolen gun, and the victim identified Mr. Roe in a line up as the man who robbed him with Mr. Watson.

This Court finds the unsubstantiated information regarding an alibi witness provided to this Court eight years after trial to be a self-serving claim that is not credible.  This claim does not provide that counsel's performance was deficient and is therefore denied without hearing based on La. C.Cr.P. Art. 929 A.

Defendant's second claim alleges that counsel's performance was deficient for failing to file a Motion to Sever on the two counts of armed robbery.  Defense counsel in fact filed a Motion to Sever the offenses which was denied in this Court and also reviewed in the Fourth Circuit Court of Appeal.  See appellate decision, State v. Roe, 151 So. 3d 838 (2014).  This claim is therefore denied as incorrect and repetitive.

Defendant's third claim alleges that counsel's performance was deficient for failing to file a motion to suppress identification.  Defense counsel filed a Motion to Suppress Identification, along with defense motions which were heard and denied by this Court on May 24, 2021.  This claim is therefore incorrect and denied.

Based on the above, the present Post-Conviction Relief Application is denied.[19]

On supervisory review of that denial, petitioner was equally unsuccessful.  The Louisiana Fourth Circuit Court of Appeal simply stated:  "We find no error in the district court's denial of the pro se relator's application for post-conviction relief.  Accordingly, the relator's writ application is denied."[20]  The Louisiana Supreme Court then likewise denied relief, succinctly holding:  "Denied.  Applicant fails to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[21]

Where, as here, a habeas petitioner's ineffective assistance of counsel claims were denied on the merits in the state courts, he faces even greater obstacles to obtaining relief on the claims in federal court.  Because such claims present mixed questions of law and fact, the petitioner is

---

[19] State Rec., Vol. 2 of 11, Ruling with Reasons dated March 13, 2019.
[20] State v. Roe, No. 2019-K-0751 (La. App. 4th Cir. Sept. 19, 2019); State Rec., Vol. 10 of 11.
[21] State v. Roe, 299 So. 3d 52 (La. 2020); State Rec., Vol. 10 of 11.

entitled to federal habeas relief only if he shows that the state court decision denying the claims was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).

Under that deferential standard of review, the determinative factor is not simply whether counsel was ineffective in the independent view of the federal court; rather, it is "whether the state court's application of the Strickland standard was unreasonable."  Richter, 562 U.S. at 101. Therefore, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable.  **The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard**."  Id. at 105 (emphasis added).  That makes a petitioner's already difficult task even more so, because it requires the federal court to accord the state court decision "a deference and latitude that are not in operation when the case involves review under the Strickland standard itself."  Id. at 101; see also id. at 105 ("The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.").  As a result, in effect, the federal court must "afford **both** the state court **and** the defense attorney the benefit of the doubt."  Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation marks omitted).

For the following reasons, the Court finds that, under that doubly deferential standard of review, it cannot be said that relief is warranted with respect to any of petitioner's ineffective assistance of counsel claims.

As noted, petitioner's first claim is that his counsel was ineffective for failing to investigate and present an alibi defense.  Specifically, petitioner alleges:

[C]ounsel did not conduct any per-trial investigation to obtain the testimony of petitioner's alibi witness who was his supervisor at petitioner place of employment. Petitioner's supervisor's testimony would have support petitioner's defense that he was at work during the time this crime was committed.  Defense counsel was given a copy of the sign in and out sheet that was required to be signed by all residence of the Federal Halfway House where petitioner was staying.  The sign in and out log shows that on January 17th, 2011 (the day of the alleged robbery) petitioner signed out for work at 2:00 p.m. and signed back in at 3:35 a.m.  Defense counsel was also provided with the name of petitioner's supervisor (Karl Brown), place of employment name (Black Tie Services,) the address (301 Burgundy Street), phone number at time (504-586-9310).  Petitioner's supervisor's testimony would have confirmed that petitioner was at work between the hours of 6:30 p.m. And 9:00 p.m. and could not have been one of the suspects who committed this offense on January 17th, 2011.

    … [T]he facts recited above demonstrate that defense counsel made no attempt to contact petitioner's supervisor, nor did counsel attempt to learn the names of other employees of the Black Tie Service where petitioner was employed. The employees that were working with petitioner at the time could have testified that petitioner did not leave work before 2:00 a.m.  The sign in/out sheet shows that petitioner signed back in the Federal Halfway House at 3:35 a.m.[22]

However, as the state district court correctly noted in denying post-conviction relief, petitioner's claim fails because he simply has not met his burden of proof for the following reasons.

As an initial matter, petitioner has offered no evidence establishing that his trial counsel did not in fact investigate whether petitioner was actually at work on the day in question.  Rather, he simply speculates that counsel failed to investigate the issue, and it is beyond cavil that bare speculation does not suffice to meet a petitioner's burden of proof.  See Massey v. Cain, Civ. Action No. 14-2952, 2016 WL 5376239, at *9 (E.D. La. June 21, 2016), adopted, 2016 WL 5362992 (E.D. La. Sept. 26, 2016); see also Ross v. Estelle, 694 F.2d 1008, 1011 (5th Cir. 1983) ("Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his *pro se* petition (in state and federal court), unsupported and unsupportable by

---

[22] Rec. Doc. 1-1, pp. 9-10 (citation omitted).

anything else contained in the record, to be of probative evidentiary value."). Without evidence proving that counsel failed to investigate this aspect of the case, petitioner has not established that counsel's investigation was deficient.

Further, in any event, petitioner must also prove that prejudice resulted from the purportedly inadequate investigation. To make that showing, he must point to evidence establishing that a more thorough investigation would have actually benefited the defense; specifically, he is required to show **both** that exculpatory evidence existed **and** that further investigation would have revealed that evidence. See Moawad v. Anderson, 143 F.3d 942, 948 (5th Cir. 1998); see also Brown v. Dretke, 419 F.3d 365, 375 (5th Cir. 2005); Wilson v. Cain, Civ. Action No. 06-890, 2009 WL 2163124, at *22 (E.D. La. July 16, 2009), aff'd, 641 F.3d 96 (5th Cir. 2011); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *10 (E.D. La. Dec. 11, 2008).

Here, as the state district court noted, petitioner has failed to make that showing. Although he proffered the halfway house sign-out sheet, that sheet proves only that petitioner **said** he was leaving in order to go to work, **not that he actually did so**. To show that he was prejudiced by counsel's performance, petitioner must instead produce evidence verifying that (1) he actually appeared for his job, (2) he was at work at the time of the crime, and (3) other people could and would have so testified. As the state district judge noted, petitioner could have made that showing by producing affidavits from his supervisor or co-workers, but no such affidavits – or any comparable evidence whatsoever – was produced. Without any such evidence, he has likewise failed to meet his burden of proof on Strickland's prejudice prong. See, e.g., Higgins v. Cain, Civ. Action No. 09-2632, 2010 WL 890998, at *9 n.24 (E.D. La. Mar. 8, 2010) ("To the extent that

petitioner is claiming that counsel was ineffective in failing to mount an alibi defense, he has failed to establish that any evidence … existed on which a viable alibi defense could have been based. Without such evidence, there is simply no basis for a finding that defense counsel wrongly eschewed a viable alibi defense."), aff'd, 434 F. App'x 405 (5th Cir. 2011) (quotation marks omitted).

To the extent that petitioner is separately faulting counsel's failure to call the supervisor or co-workers to testify at trial, that fails for essentially the same reason. "A prisoner's bald conclusory assertion that supposed 'alibi' witnesses were not called does not serve to overcome the strong presumption that his counsel's actions were reasonable." Sayre v. Anderson, 238 F.3d 631, 636 (5th Cir. 2001) (quotation marks omitted). On the contrary, as the United States Fifth Circuit Court of Appeals has explained:

> Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain. For this reason, we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing that the testimony would have been favorable to a particular defense. This requirement applies to both uncalled lay and expert witnesses.

Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010) (citations, quotation marks, and brackets omitted); accord Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.").

However, again, petitioner presented no evidence, such as affidavits from the uncalled witnesses, demonstrating that they would have testified in a manner to establish an alibi or in any other respect beneficial to the defense. Therefore, again, he failed to meet his burden of proof with respect to this claim. See, e.g., United States v. Cockrell, 720 F.2d 1423, 1427 (5th Cir. 1983) (courts view "with great caution claims of ineffective assistance of counsel when the only evidence of a missing witness's testimony is from the defendant"); Buniff v. Cain, Civ. Action No. 07-1779, 2011 WL 2669277, at *3 (E.D. La. July 7, 2011); Anthony v. Cain, Civ. Action No. 07-3223, 2009 WL 3564827, at *8 (E.D. La. Oct. 29, 2009) ("This Court may not speculate as to how such witnesses would have testified; rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue."); Combs v. United States, Nos. 3:08-CV-0032 and 3:03-CR-0188, 2009 WL 2151844, at *10 (N.D. Tex. July 10, 2009) ("Unless the movant provides the court with affidavits, or similar matter, from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice."); Harris v. Director, TDCJ-CID, No. 6:06cv490, 2009 WL 1421171, at *7 (E.D. Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance.").

For all of these reasons, it is clear that petitioner has not demonstrated that the state court decision rejecting his first ineffective assistance of counsel claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such a claim, this Court should likewise deny relief on that claim.[23]

---

[23] Out of an abundance of caution, the Court takes note of the following statement in the state's response:

Petitioner's second claim is that counsel was ineffective for failing to file a motion to sever

the two counts of armed robbery. In opposing that claim, the state merely points to the district

judge's observation that a motion to sever was filed but denied and that the denial was later

affirmed by the Court of Appeal.[24] However, while that it is in fact what the state district judge

opined in denying the claim, it is misleading and does not necessarily end the matter.

---

> It is arguable that the state post-conviction court should have held a hearing reviewing the
> evidence before denying the claim. The question here, is whether that decision was unreasonable.
> If this Honorable Court finds that the trial court erred in not conducting a hearing regarding the
> issues raised in Roe's first claim, the State is not opposed to staying this matter so that Roe can
> exhaust this claim in state or conducting such a hearing in federal court.

Rec. Doc. 26, p. 14. While that is a generous offer, it must be declined.

As an initial matter, it must be noted that the state court was not required to hold a hearing. Louisiana law expressly provides for the summary disposition of post-conviction applications. See La. Code Crim. P. art. 929(A) ("If the court determines that the factual and legal issues can be resolved based upon the application and answer, and supporting documents, including relevant transcripts, depositions, and other reliable documents submitted by either party or available to the court, the court may grant or deny relief without further proceedings.").

Moreover, "[a] state court's decision on such matters is not reviewable in federal court." Gatlin v. Deville, Civ. Action No. 18-4055, 2018 WL 7291064, at *15 (E.D. La. Dec. 19, 2018), adopted, 2019 WL 585354 (E.D. La. Feb. 13, 2019). Further, the fact that no such hearing was held is immaterial for the purposes of this federal proceeding because "a full and fair hearing is not a prerequisite to the operation of AEDPA's deferential scheme." Valdez v. Cockrell, 274 F.3d 941, 946 (5th Cir. 2002); accord Bass v. Dretke, 82 F. App'x 351, 354-55 (5th Cir. 2003) ("Simply put, deference is not dependent upon the existence of a full and fair hearing in the state habeas proceeding.").

Lastly, because the state courts denied petitioner's claim on the merits, this Court is actually **prohibited** from holding an evidentiary hearing on the claim. The United States Supreme Court has explained:

> [R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated
> the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication
> that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of,
> established law. This backward-looking language requires an examination of the state-court
> decision at the time it was made. It follows that the record under review is limited to the record in
> existence at that same time i.e., the record before the state court.

Cullen v. Pinholster, 563 U.S. 170, 181-82 (2011). The Supreme Court then emphatically reiterated: "[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." Id. at 185.

"Pinholster thus imposes a new limitation on the availability of evidentiary hearings in habeas cases …. Pinholster prohibits a federal court from using evidence that is introduced for the first time at a federal-court evidentiary hearing as the basis for concluding that a state court's adjudication is not entitled to deference under § 2254(d)." Blue v. Thaler, 665 F.3d 647, 656 (5th Cir. 2011); accord McCamey v. Epps, 658 F.3d 491, 498 (5th Cir. 2011) (declining to consider evidence developed in a federal evidentiary hearing); Pape v. Thaler, 645 F.3d 281, 288 (5th Cir. 2011) (holding that district court erred in conducting an evidentiary hearing and relying on evidence from that hearing to consider whether the state courts had unreasonably applied federal law under § 2254(d)(1)).

[24] Rec. Doc. 26, pp. 14-15.

It is true that counsel filed a pretrial motion to sever.  However, in that motion, counsel requested that the court **sever Counts 1 and 2** (the armed robbery counts) **from Count 3** (the count for possession of a firearm by a convicted felon).  Petitioner's ineffective assistance claim is that his counsel instead should have filed a motion to **sever Count 1 from Count 2**.  And, as he correctly notes in his federal application, no such pretrial motion making that argument was filed.

It is also true that petitioner's appellate counsel nevertheless did in fact argue on direct appeal that the trial court erred in not severing the counts of armed robbery.  However, again, there is a potential flaw:  the focus of appellate counsel's argument was that the joinder of the two armed robbery counts prejudiced petitioner **with respect to Count 2**.[25]  In rejecting the argument, the Court of Appeal seemingly did so primarily because it was already reversing petitioner's conviction on Count 2 on other grounds, and therefore that argument was "moot."[26]

Considering the foregoing, the undersigned is unconvinced that the claim that petitioner presents here (i.e. that his counsel was ineffective for failing to file a motion to **sever the two counts of armed robbery** because it **prejudiced him as to Count 1)** was considered and disposed of by the state courts.  Nevertheless, even if not, and even if the AEDPA's deferential standards of review would therefore not be applicable, petitioner still would not be entitled to relief on this claim because it fails on *de novo* review for the following reasons.  See Berghuis v. Thompkins,

---

[25] See State Rec., Vol. 3 of 11, Appellant's Brief, pp. 12 and 15.  In Count 2, petitioner was charged with the armed robbery of Troy Elzy on January 21, 2011.  Although petitioner was convicted of the that crime at trial, that conviction was reversed by the Court of Appeal on direct appeal.

[26] State v. Roe, 151 So. 3d 838, 861-62 (La. App. 4th Cir. 2014) ("Roe's argument in this assignment of error focuses on the charge in Count 2.  He argues that the facts concerning his participation in the earlier 17 January 2011 armed robbery allowed the prosecutor to bootstrap evidence of one offense where there was an identification (meaning the Henley robbery) to the other (the Elzy robbery) where the evidence was lacking.  However, as we have concluded that the evidence was insufficient to support Roe's conviction of the 21 January 2011 armed robbery of Elzy, the severance issue is moot."); State Rec., Vol. 6 of 11.

560 U.S. 370, 390 (2010) ("Courts can ... deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review, see § 2254(a).").

Under Louisiana law, charges may be joined and tried together, as follows:

> Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.

La. Code Crim. P. art. 493.

It is true, of course, that Louisiana law also provides: "If it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires." La. Code Crim. P. art. 495.1. However, "[a] defendant bears a heavy burden of proving prejudicial joinder of offenses, and he must make a clear showing of prejudice." State v. Hugle, 104 So. 3d 598, 611 (La. App. 4th Cir. 2012). It has been held:

> In determining whether joinder of two or more offenses would result in prejudice, a court should consider:  (1) whether the jury would be confused by the various counts; (2) whether the jury would be able to segregate the various charges and evidence; (3) whether the defendant would be confounded in presenting his various defenses; (4) whether the crimes charged would be used by the jury to infer a criminal disposition; and (5) whether, especially considering the nature of the charges, the charging of several crimes would make the jury hostile.

State v. Carter, 779 So. 2d 125, 146 (La. App. 4th Cir. 2001). That said, "[g]enerally, there is no prejudice and severance is not required if the facts of each offense are not complex, and there is little likelihood that the jury will be confused by the evidence of more than one crime." Id.

(quotation marks omitted).  Further:  "In many instances the trial judge can mitigate any prejudice from joinder of offenses by providing clear instructions to the jury.  The prosecutor may further curtail any prejudice with an orderly presentation of evidence."  <u>Hugle</u>, 104 So. 3d at 611 (citation and quotation marks omitted).

Here, although the two armed robberies were different crimes committed on different days, they were committed only four days apart and were of a similar character.  The robbery on January 17 was committed by two individuals;[27] a gun was used to effect the robbery;[28] the victim was told to "give it up";[29] the robbery occurred "between 6:00-7:00 p.m.,"[30] and the victim's vehicle was taken in the robbery.[31]  The robbery on January 21 was committed by two individuals;[32] a gun was used to effect the robbery;[33] the victim was told to "give it up";[34] the robbery occurred at "night,"[35] and the victim's vehicle was taken in the robbery.[36]  Moreover, the two crimes were not factually confusing or complex, and so there was little chance that the jury would have been confused by the prosecution's presenting evidence of the two crimes together.  Given those realities, it is unlikely that petitioner's counsel could show that his client would be prejudice **as to Count 1** by the failure to sever that count, and so one would be hard-pressed to say that counsel performed deficiently by electing not to pursue such a motion.[37]

---

[27] <u>State v. Roe</u>, 151 So. 3d 838, 843 (La. App. 4th Cir. 2014); State Rec., Vol. 6 of 11.
[28] <u>Id.</u>
[29] <u>Id.</u>
[30] <u>Id.</u> at 844.
[31] <u>Id.</u> at 843.
[32] <u>Id.</u> at 848.
[33] <u>Id.</u> at 847.
[34] <u>Id.</u> at 848.
[35] <u>Id.</u> at 847.
[36] <u>Id.</u> at 848.
[37] As noted *supra*, counsel did argue that petitioner would be prejudiced **as to Count 2** by the failure to sever.  That, however, is easily explainable.  There was compelling evidence that petitioner was guilty of Count 1:  he was **both** emphatically identified by the victim of that crime as one of the robbers **and** found in possession of the firearm stolen

Nevertheless, even if counsel were found to be deficient in that respect, petitioner cannot establish that he was prejudiced. Again, the evidence that petitioner was guilty of Count 1 was compelling: he was identified by the victim and actually found in possession of the gun stolen in the robbery. Given such damning evidence of guilt, it is not reasonably likely that the result in this case on Count 1 would have been different simply if that count had been severed and tried separately. See, e.g., Easley v. Dretke, 122 F. App'x 124, 131 (5th Cir. 2005) ("This court has held on several occasions that overwhelming evidence of a defendant's guilt supports the conclusion that she suffered no prejudice as a result of her counsel's performance and mistakes.").

For these reasons, petitioner's second claim fails even on *de novo* review.

Petitioner's third and final claim is that his counsel was ineffective for failing to file a motion to suppress the identification. In its response in this proceeding, the state notes that the state district judge rejected the claim on the basis that a motion to suppress the identification **was** in fact filed and denied in the case.[38] However, again, the matter is not quite that simple.

It is true that a motion to suppress the identification was filed in this case; however, that motion was filed on behalf of petitioner's co-defendant by his counsel.[39] Nevertheless, at the hearings on that motion, petitioner's counsel did in fact argue that the identification of **petitioner** by the victim on Count 1 should be also suppressed, and the trial court denied that argument on

---

during that robbery. However, the evidence that petitioner was guilty of Count 2 was far less compelling; so much so that his conviction on that count was eventually reversed on appeal due to insufficient evidence. State v. Roe, 151 So. 3d 838, 858-61 (La. App. 4th Cir. 2014); State Rec., Vol. 6 of 11. It is obviously easier to envision the possible prejudice resulting from joining an offense with weak evidentiary support to an offense with solid evidentiary support, because one could fear that the jury impermissibly convict the defendant of the former (despite the evidentiary failings) simply because he was so clearly guilty of the latter. But that possible prejudice exists only as to the weaker charge (here, Count 2), not the stronger one. The prosecution's case on a strong charge is not similarly bolstered by adding a second more dubious charge.

[38] Rec. Doc. 26, p. 15.
[39] State Rec., Vol. 4 of 11.

the merits.[40]  Therefore, despite the fact that petitioner's counsel failed to file his own motion to suppress the identification (or even to join in the co-defendant's motion), petitioner was not prejudiced because **the issue was nonetheless still considered by the court and the identification was ruled to be admissible**.  Accordingly, even if petitioner might arguably prevail on Strickland's first prong with respect to this claim, his claim still falters on the second.

For all of these reasons, petitioner is not entitled to relief on any of his three ineffective assistance of counsel claim.

## RECOMMENDATION

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Jason M. Roe be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this ___12th___ day of November, 2021.

**DANA M. DOUGLAS**
**UNITED STATES MAGISTRATE JUDGE**

---

[40] State Rec., Vol. 5 of 11, transcript of February 9, 2012; State Rec., Vol. 3 of 11, transcript of May 24, 2012.